Welcome to the Ninth Circuit, Mr. Konopka. Thank you, Judge Bea. It's a pleasure to see you again. Good morning, Your Honors, and may it please the Court. I'm Eric Konopka, representing North Bay, the appellant. I'd like to reserve four minutes for rebuttal, but I'll watch the clock. In this case, North Bay filed a nearly 50-page complaint that explained that Solano County is the most concentrated health insurance market in California, and that that's due to Kaiser Health's near-complete monopoly in that market. The complaint explained how Western Health Advantage in North Bay, its 50 percent owner and network hospital system, threatened that monopoly, and it detailed three specific ways that Kaiser attacked North Bay to maintain its monopoly. Yet despite these extensive allegations, the District Court dismissed the complaint, and in doing that, it made three key errors. First, the Court ignored what was going on in the market and the threat that North Bay and Western posed to Kaiser's insurance monopoly, which is critical context when you're evaluating a monopoly maintenance claim. Second, the Court was inappropriately skeptical of the specific allegations of exclusionary conduct that Kaiser engaged in, including steering of patients, the tearing up of a long-term, voluntary, mutually beneficial reimbursement agreement, and an overnight 50 percent reduction in payments to North Bay. And third, the Court misunderstood the nature of North Bay's antitrust injury and the clear legal authorities on which it rests. Now, I'd like to address these points in turn, but I'm happy to answer any questions the panel might have. As I mentioned at the beginning, I'd first like to start kind of with the market and what was going on in the market at the time, both because we're on a motion to dismiss and we're entitled to have the allegations of our complaint looked at as a whole, and also because differentiating between vigorous competition on the merits by a monopolist from exclusionary conduct depends a lot on the context. And what we see in this case is that Kaiser controlled nearly 90 percent of the Solano County commercial health insurance market. It faced little competition there, with some rivals exiting or shrinking in the market. And Western, which was already Western's only serious competitor in the market at the time, became a more significant competitive threat, increasing its market share by 30 percent from 2012 to 2015. And it was able to do that because North Bay, again, its in-network hospital system and 50 percent owner, had engaged in a $400 million massive pro-competitive investment campaign to improve its programs, facilities, and services. And Kaiser, seeing both Western's upswing and North Bay's financial vulnerability after engaging in that campaign, decided to act. And it took three actions in response. Those were, Kaiser gained the ability in 2016, after seeing its market share decline for three consecutive years, to steer trauma patients. And it began to do that. Now, the thing to keep in mind there is Kaiser had the opportunity, as the Solano County Trauma Bay Station, to do that. It gained that ability in 2016. It had the incentive to do that, both because North Bay, as the most centrally located trauma facility in the county, should receive an overwhelming portion of the trauma patients in the county, and those trauma patients usually bring in significant revenue for hospitals. Let me ask you this. Right there, when you're talking about the steering and the fact that Kaiser had the trauma-based center, was it Vacaville? Vacaville, yes. The district court, or the magistrate judge, seemed to not take those allegations, found them implausible. Not that the claim was implausible, but the allegations. Essentially, as I understood it, suggesting that why would doctors who have this ethical responsibility engage in such conduct? I think the district court did do that. It's just, you know, we can't. This is just contrary to a doctor's. Hippocratic oath. Hippocratic oath, so we can't really take this for what they say. I think the district. I'm sorry. What's wrong with that? Well, what's wrong with that is that we're at a motion to dismiss, and we're entitled to have our allegations treated as true. And I'd note that Kaiser tries to reiterate that error in its briefing here. We're at a motion to dismiss. We're entitled to have our allegations as being treated as true and reasonable inferences they're from. They're plausible. Well, it's not the allegations that have to be plausible. Even. It's the claim that has to be. It's the claim. It's the claim has to be plausible. Exactly. So what Twombly and Iqbal set up is that you still have to treat even allegations that you don't think will be proven out or borne out as being true, and you have to give us the reasonable inferences they're from. And then taking all of those things together, then you determine whether you've plausibly stated a claim. So as I understand it, what you're saying is that these three Kaiser entities, the hospitals, the insurance plan, and the doctors group, Permanente, whatever it's called, that they essentially conspired together to do these various things. Well, our monopoly maintenance claim is dependent on an agency relationship between the three. Well, agency, whatever. They're all connected together. Correct. And they work together. Right. Kaiser is an integrated, as we understand it, it's an integrated health care system. Kaiser Health sells insurance, and that gets you access to Kaiser doctors, Kaiser hospitals, Permanente doctors. So what the thrust, at least as far as steering trauma patients goes, is that, you know, Kaiser Hospitals is running this base station and is being effectively directed by Kaiser Health to steer trauma patients away from North Bay and to itself because those patients are lucrative. And we don't, just to be clear, we think we're entitled to the truth of those allegations, but we also don't think that that's kind of a crazy idea that Kaiser would direct its doctors to do that. We could probably point to examples, a few minutes on Google would probably point to examples of doctors doing that, of doctors engaging in sort of self-interested behavior, especially in circumstances in which, you know, they might sort of over the grand scheme of things might think that on average it doesn't do harm to the patient. Or they're going to get care down the road rather than here or something. That perhaps it's certainly possible that a doctor might think, well, in most cases it won't make that much of a difference, but that's not what the trauma routing protocols allow. What the trauma routing protocols allow is to ensure that the patient gets the most appropriate care as soon as possible. And in the vast majority of cases that's going to be North Bay. But the Kaiser doctors are paid from the Kaiser agency relationship. That's correct. They are all tied in. We have alleged extensive financial dealings between them. They're contractually interwoven. They share profits. Kaiser Health and Kaiser Hospital share boards of directors, and it's an extremely profitable system. Mr. Kanaka, please, would you direct your attention to the difference between conduct which is consistent with liability, which you've painted quite adequately, and actual anti-competitive acts. What anti-competitive acts specifically are alleged in the complaint to meet the requirements of Iqbal and Twomley? Certainly, Your Honor. So in this case, in a monopoly maintenance claim, Kaiser Health, as a monopolist, is not allowed to engage in certain acts that even an ordinary business enterprise would do. That's sort of a general principle of a monopoly maintenance claim. So acts, so the steering allegations as well as the termination of the contract, followed by a massive cut in reimbursements to North Bay, are the specific acts that we're alleging are anti-competitive because they were undertaken by a monopolist. What steering acts do you allege were anti-competitive rather than correctly steered? Well, Your Honor, we've alleged, for example, a very specific example of that behavior as well as a massive drop-off in trauma patient volume to North Bay for no reason other than it could be explained by steering. And that is? We've alleged that North Bay, from the time before Kaiser took over the base station to after, North Bay's trauma volume dropped by 15 percent in conjunction with a specific example of that behavior. There may be some confounding elements which cause that. Fewer people moving in Solano. The injury level might be lower. All those elements might explain the lowering rate of admittance in your hospitals. What you're saying you're entitled to discover? What we're saying is that if they want to raise a factual defense to it, they can certainly do that at summary judgment or trial. And we did allege specifically, I believe it was in paragraph 53 of our complaint, that we knew of no independent reason for the drop-off in trauma volume other than steering or other than some behavior by Kaiser. So you have this other allegation that Kaiser terminated the reimbursement contract that they had and then began paying at a significantly lower rate than what they had been paying under the contract, which resulted in lower, I guess, revenue. To North Bay. To North Bay. That's correct. But there's no claim that the termination under the contract was a breach of the contract. Apparently they had the right to do that, correct? The contract, as I understand it, was terminable at will. That's correct. So how does the fact that they charged a higher or they paid a lower rate, how does that fit into your whole theory? Sure. So the charging of the payment of the lower rate is so under the contract, Kaiser was already paying sort of below what we allege was a below market rate that we felt was reasonable to allow us to continue to invest. And the point of the reduction in payments is that Kaiser didn't just cut its payments from 50 percent of, say, our charge master rate of what we would normally charge to anyone walking up the street. They cut their rates by 50 percent of the negotiated rate that they had contractually agreed to. And under state law, they're required to pay reasonable and customary charges. And our contention is that cutting a negotiated rate by 50 percent overnight with no change in service and no other circumstances to explain it and without even giving any reason for it shows that that was unreasonable and shows that they were really intending, what they were really trying to do is deprive North Bay of the funding while it recovered the funds through a state court lawsuit so that it wouldn't have the money that it could continue its investment. Do you have any cases which say that a cutting of a rate by 50 percent is ipso facto an anti-competitive act? I don't believe there are any cases. What the case law recognizes is that a monopolist can engage in exclusionary conduct in myriad ways. That's cases like United States versus Microsoft and various other cases. Because the types of ways that they could seek to exclude their competitors on some basis other than the merits, it's just too innumerable to really fathom. And so what we're saying is that this is just one way that they were trying to starve North Bay of revenue to keep it from continuing its improvements and to keep Western from becoming a more attractive insurance option. So the other thing I understood about the district court's order was that there was no antitrust injury here. That is the other issue that the district court pointed out. And, you know, I think when thinking about antitrust injury, it's worth starting from the statutory text. You know, Sherman Act, or sorry, Clayton Act Section 4 says that any person injured by any, by reason of anything forbidden under the antitrust laws can recover. Now, antitrust injury is a gloss or a limitation on that, but the Supreme Court has been clear that we don't artificially engraft artificial limitations on that and that there's no black-letter rule that can govern in every case. Now, our antitrust injury comes straight out of the Supreme Court's decision in McCready as well as this court's decisions in Ostroff, Chelson, as well as a variety of out-of-circuit authority that we relied on. And all that line of cases really says is that when a person is the very means or the fulcrum or the conduit or a necessary step in carrying out an anti-competitive scheme, that person suffers antitrust injury. And that makes sense because what antitrust injury is really concerned with is the directness of the injury and ensuring that it reflects the pro-competitive purposes of the antitrust laws. And so if you've got someone who's the direct foreseeable victim of an anti-competitive scheme, it just makes sense that they would suffer antitrust injury just as much as anybody in the restrained market would. Okay. Did you want to save time for a little? I would like to save the rest of my time for a little. Okay. Thank you, Your Honor. Thank you. Good morning, Your Honors. And may it please the Court, my name is Jason Murray. I represent two of the appellees here today, Kaiser Permanente Health Foundation and Kaiser Permanente Hospitals. With me is Tom Ryan, who represents the Permanente Medical Group. With the Court's indulgence, we're splitting our argument time today. I will keep track of it, but I would like to reserve four minutes of my time for Mr. Ryan and his client. Your Honors, as Judge Bieler found, we respectfully submit that this case presents little more than an everyday reimbursement dispute between a health insurer and a hospital. In fact, that underlying dispute continues in State court now, even today, which is, again, we respectfully submit exactly where it belonged in the first place. I thought that case was stayed. There was an application for a stay. It was denied. My understanding is it's set for trial in November. That's outside the record, but appellants have put into the record, excuse me, the complaint itself, and they're welcome to contradict me, but I believe that it continues now. All right. Critically, Your Honor, and I'm going to try to limit my remarks here today to antitrust injury. That seems to be where the Court is going. Mr. Ryan will primarily address conspiracy allegations and why they're not plausible if you have questions on that. We respectfully urge this Court that the antitrust injury requirement, as this Court has found many times, exists to separate ordinary business disputes, contract, quasi-contract, torts, from harm to competition, from antitrust claims that are viable. After three attempts and lengthy amended complaints, North Bay was unable to do that, and Judge Bieler, in a well-reasoned and thorough opinion, dismissed their case finally with prejudice. Let me tell you what I found troubling about Judge Bieler's order. Yes, Your Honor. She seemed not to take the factual allegations as true. She found them, I thought, the factual allegations implausible. Well, yes, Your Honor. And that doesn't seem to be consistent with Iqbal and Trombley. Oh, I would submit just the opposite, Your Honor, and let me explain. And I can use the examples that the Court has asked about if you'd like. What Judge Bieler found was that where there are allegations that are, as required under Trombley and Kendall and others, that are equally capable of being seen as legitimate business behavior, for example, having less trauma patients if your competitor, in this case, Kaiser Hospitals, becomes the trauma center, level two trauma center for the county, and the county's guidelines require, unless the patient is somehow destabilizing, that level two trauma patients go to your hospital. That's a very plausible reason why trauma volume for North Bay might drop. In those circumstances, this Court's case law, and following and interpreting distilling Trombley and Iqbal, require further factual enhancements to show that it's not simply a result of something other than anti-competitive conduct. And that's all that Judge Bieler required here. She looked at the county protocol. She looked at the allegations. And by the way, if I may take those at a slightly deeper level, the steering allegations in the second amended complaint are really only, if you parse them carefully, one, that a sick patient wound up at North Bay. That's the steering two allegation. There's no allegation that patient wound up at a Kaiser hospital. And second, that an indigent patient wound up somewhere. There's no allegation in that paragraph, paragraph 55 of the second amended complaint, that the patient, the indigent patient, was steered to North Bay. So under those circumstances, Your Honor, we submit that Judge Bieler did exactly what she's supposed to do under this Court's precedent. Well, the complaint also alleges that because Kaiser, Vacaville, whatever it's called, is a trauma center, it has the responsibility to direct where patients go. Well, that's correct. And that's an equally plausible, at least, if not more plausible, reason why North Bay's trauma volume might have gone down. By the way, that was awarded in a competitive bidding situation. North Bay competed, Kaiser. I don't think they're complaining about that. The fact is, is that they were, Kaiser is the trauma center. That's correct, which is, again, Your Honor, that's why something more is required, a factual enhancement, before the inference can be drawn that, you know, as you pointed out, one of your honors pointed out, why judges, paramedics, apparently even the Vacaville Fire Department might have reasons to send trauma patients other than a conspiracy to monopolize the health insurance market. There's the county trauma guidelines. If I may address a couple of other points about antitrust injury, Your Honor, I think you've honed in on the most important one, which is that there's no unlawful conduct here sufficient to require or to allow a claim of monopoly maintenance. The second act of unlawful conduct, it's alleged, is nothing more than the termination of an at-will contract in order for Kaiser to lower its costs. That's pro-competitive, not anti-competitive, and even the outlier cases that plaintiffs cite in their, excuse me, that appellants cite in its opening brief following Aspen skiing do not go that far. Aspen skiing's a refusal-to-deal case. There's no refusal-to-deal here. There's simply a refusal to pay North Bay as richly as it would like to be paid. As this Court pointed out in Aerotech, that is not the stuff of which monopoly maintenance claims are made. Is it of concern, I guess, to North Bay that there was a recording, just anywhere in the recording, where Kaiser says, is this a Kaiser patient? Does that cause concern? Well, Your Honor, I would respectfully submit that Judge Buehler did not rely or take judicial notice of that recording, and it's not necessary for this Court to affirm it. But, no, it should be of no cause, no concern whatsoever. In fact, integrated health plans like Kaiser, and let me just pause to say, if that were enough to state a conspiracy claim, then every integrated health plan in America is somehow an unlawful conspiracy, and that can't be the case. Well, the problem here, though, is that Kaiser has such a dominant position in the Solano market. Well, it's only a... I mean, it's... Yes, Your Honor, it's only a problem. It's the market. I mean, it's the provider in Solano County. And as Trinko and the United States Supreme Court precedents made clear, that is no crime. Being the best... I didn't say it was a crime. They're just alleging that, you know, essentially as a monopolist, they have a lot of power in that market. Even monopolists... And they can't do it to wipe out the remaining competition. They can't use it in such a way as to wipe out the remaining competition. Well, they certainly can't, Your Honor. But as Judge Buehler found here, they didn't, nor were they plausibly alleged to have done so. And if I can just turn back to Judge Jack's question, no, it's not an antitrust violation for a Kaiser doctor to send a Kaiser patient to a Kaiser hospital. That's why we have integrated health plans to lower costs for consumers, create more competition, and improve the health care system. But to have it as a triage question, I just wondered if it might raise concerns. Well, again, I don't want to delve too deeply into that transcript. Yes, it is part of the record, but it is on appeal, but it is not something that Judge Buehler relied upon in reaching her decision. The transcript makes plain, if you look at it, I think it's supplemental excerpts of record, it makes plain that the doctor said, hey, assuming she's fine, is she a Kaiser patient? If she's not, do what you've got to do in the field. Send her where you need to send her. That's what the transcript says. But it's not important, because in order to make out a claim for anticompetitive conduct, they have to show a pattern of steering, not that just one doctor got one thing wrong. And, by the way, going to Judge Buehler's question about ‑‑ But how would they get that information without discovery? Your Honor, to get to discovery, that would be to put the cart before the horse. The very reason we have stringent antitrust injury requirements in cases like this is to prevent, unless there are plausible allegations sufficient ‑‑ It's efficient. Yeah. That's why the antitrust injury requirement is there, Your Honor, set up first by the Supreme Court and reiterated many times in American Ad Management and the 19 years since, Kendall Musical Instruments, is to prevent the massive cost of discovery, the interim effect on settlement that a few allegations could otherwise set off. And here, if one looks carefully at those allegations, and Judge Buehler did. Again, she allowed them three chances to amend. There's no there there. If I could just dispose ‑‑ But that gets back to the problem that I articulated earlier, which is that she seems to say that the facts alleged are just not plausible. Your Honor, they're not. As opposed to the claim is not plausible based upon the facts that are alleged, which you need to take as true. Oh, I understand what Your Honor is after now. No, I submit to you she very, very carefully, in a lengthy and thorough opinion, did exactly that. She walked through each step of the antitrust injury element of the claim and determined that the factual allegations as to that element were not plausible, and that was appropriate. If I could deal very quickly, Your Honor, in my one minute and 20 seconds. Yes, I beg your pardon. I don't think you quite answered what Judge Pius was asking. One thing is a fact and the other thing is a claim. Yes, Your Honor. She can find that the claim is not plausible, but she can't find that the facts are not plausible on 12b6. She found no such thing, Your Honor. She didn't ‑‑ I'm sorry if you were still speaking. I apologize. No. I mean, you can see the difference between a claim, which arises from some facts. She's got to take the facts as they're alleged under 12b6. She may say those facts do not plausibly make a claim, but you can't very well say she can say the facts are not plausible. Your Honor, I'm not trying to suggest, and I thank you for the clarification, that she found any facts whatsoever. She, again, parsed the elements of the claim, and because the conduct that was alleged is, frankly, so minimal and so off base with the typical monopolization claims, right, exclusive dealing, predatory pricing, tying, she looked at each of them and said, even these factual allegations are insufficient because I see other equally plausible reasons why this conduct could have taken place. And that's what she was supposed to do under Twombly, Kendall, and this Court's precedent. And what were those equally plausible facts? Not facts, but ‑‑ Claims. Claims. Excuse me, Your Honor. As I mentioned in steering, she said first, the county guidelines and the fact that this is a trauma hospital require factual enhancement before I'll believe doctors are off, I will infer that doctors are off, you know, breaking their Hippocratic oaths. And second, by the way, there's, again, no who, what, when, where of any of these alleged agreements to conspire. And I have to wrap up very carefully to allow Mr. Ryan some time, if I may. We just have some students coming in. Oh. Okay, thank you, counsel. Even better. Yeah. Thank you, Your Honor. Some of them outside. Wait. Excuse me, Your Honor. Just hold on one second. The students who are out there who want to come in and watch, they can come up and sit in this front row up here. Maybe not the teachers. Thank you. Sorry to interrupt. We'll put four minutes back on the clock. That's very kind of you, panel. Good morning, Your Honor. May it please the Court. My name's Tom Ryan. I have the privilege of representing the Permanente Medical Group. I would like to split my time. I'm going to give you some context in what I think are crucial for you to think about, and then I'm going to use the last two minutes to address some of the questions that I have. Some of the questions that I believe you've already raised about plausibility, about claims versus facts, and what facts are really here, and aren't these troubling, and should there be discovery. To begin with, we're only a defendant in one cause of action, the conspiracy cause of action. It was dismissed properly under Twombly and Kendall. Twombly basically holds you have to plead plausible claims before you get discovery. Here, the context of plausibility, when this case started, we were being sued for trying to monopolize doctors in Northern California. That left after the first motion dismissed. Then it became, well, this isn't really about trying to hurt them, a competitor. This was about trying to hurt WHA, a plan. And most recently it's become, well, we're an agent. We're all mixed in together. We know that you're all really one people. Those raise real issues of let's see what the actual facts are and then apply it to the law in this circuit. The actual facts are, yes, we have contracts to provide medical services to Kaiser patients. We get paid to see Kaiser patients at these hospitals. The concept that in order to somehow gild the lily, we have engaged in steering to take patients in ambulances to get the last penny, I understand on a motion dismissed we can't contest that, but we find it offensive, to be honest with you. And the concept of we got caught with our hands in the cookie jar makes us go down one level to what actually was alleged against us. Didn't the district court seem to agree with that? I think everybody agrees that steering, if you can really show steering, that's an element of antitrust violation. No, that she found it implausible that doctors would do such a thing because Judge Bea reminded me of the doctor's hypocritical. I understand that we all hope doctors do the right thing. I think if there was actually a plausible allegation or any factual allegation, I'll leave plausible to the claim, if there was actual factual allegations that we were doing that, she has to ignore the fact that she hopes that's not true. Why don't we look at what was actually alleged against us? They need an agreement to conspire. They don't allege anywhere in this complaint that we conspired, that we agreed with Kaiser Foundation plan and Kaiser Foundation Hospital, hey, let's take out WHA. We don't like this plan in Solano County. We're going to help you take them out. That's not in their complaint. They allege there was a contract that was terminated, a contract we're not a party to, a contract that they apparently had the right to terminate, and their only allegation against us is in paragraph 71 of the second minute complaint. Sometime before May, we were told not that they were going to try to take out WHA as a competitor, but that they were going to terminate this plan and that, quote, some unnamed person in our medical group acceded. Under Twombly, Kendall, Music, that doesn't get you there. That's not questioning the plausibility of the facts. That's looking at the facts and saying that doesn't plausibly support this claim. Hey, let's go to steering. The allegations are twofold. Hey, we steered Kaiser patients to Kaiser facilities as opposed to sending them to them where we'd have to pay higher rates. And just as we were trying to keep our own patients, quote, unquote, own patients to us, we were sending poor patients to them. A double whammy. What do they actually allege? There's not one patient that they've alleged were a charity patient that they said ended up with them from an ambulance because we did something improper. There's nothing in that complaint where they actually say that. And that's not something you need discovery on. They know who came in their offices. The only allegation they have is one injured inpatient was sent who they had seen a year earlier and we thought was their patient. And what do the guidelines concern on trauma? If you're really, really destabilized, you go to the closest place you can get to. If you're not destabilizing, there's a reason their hospital was picked as the level two trauma center in the county. They were supposedly the best. They competed for it. They failed to get it. In the earlier complaint, they complained about it until in one of our motions dismissed we mentioned the words Norr Pennington. And then suddenly that went away. We're playing a constantly morphing whack-a-mole theory here, and I think you have to put it into context. My associate said if I said this out loud, he'd kill me, or he's actually my partner now, God bless him. I said let my people go. If you have questions, I'd be more than happy to try to respond honestly and succinctly. Okay. Thank you very much. Thank you. Thank you, Your Honors. I just have a few things I'd like to say in response. First, they repeatedly try to characterize this case as a rate dispute. This is not just a rate dispute. We've alleged lots of allegations that have nothing to do with our rates. This is about an entire anti-competitive course of conduct by a monopolist who doesn't dispute that they're a monopolist at this stage of the case. The second thing is Forsyth makes clear, Forsyth versus Humana, makes clear that steering of patients, in that case it was steering of indigent patients, describes antitrust violations, and I don't think they dispute that. The third thing is we've talked a little bit about the trauma call, and I think at this point Kaiser is really trying to disavow the contents of the trauma call, even though they cited it extensively in their briefing. And if you look just briefly at the trauma call, what it really gets you to is you see the doctor at every stage violating the routing protocol himself and trying to keep the patient away from North Bay. I think at the very beginning, the paramedic was coming from Vallejo at the southern tip of the county, and the right response for the doctor to give on the call was to send the patient to John Muir, which was the designated trauma facility at that time. The paramedic smartly wanted to take the patient to North Bay because she was a 77-year-old woman with an open head wound who had just been hit at 30 to 50 miles an hour, and that was the closest trauma center that was capable of treating her. And instead the doctor told the paramedic to take the patient to Kaiser Vacaville instead, which was just not the right call. And then in the second call later, and also asked about insurance, which he was not allowed to do under the routing protocol. And then in the second call, when at that point the patient was really decompensating, the right answer was to send the patient to North Bay, and instead at that point the doctor was trying to route the patient to John Muir, where he had been racing away from. So we think that it's a clear example of steering, and the reality is the allegations that we have of exclusionary conduct are fairly— this case is not like Twombly or Kendall or In Ray Musical Instruments. The discovery in this case will actually be fairly limited. We've alleged three very specific types of exclusionary conduct concerning a single health system plaintiff and a single health system defendant in a small county in California. It wouldn't take that much time to review a few hundred or a few thousand trauma patient calls to see whether there's more evidence of this kind of steering. It wouldn't take that much effort to sort of look and see whether there was something else to their decision to terminate the contract. Do you have any response to the Permanente group? So I think, as we've made clear in our briefing, our conspiracy claim is really alternative. We really do think that the right way to look at the case is as the unilateral conduct of Monopolis through its agent. We don't know exactly what discovery is going to reveal, and we think a conspiracy claim is potentially viable depending on what the economic relationship shakes out to be. But the other reality is all of the cases that they cite, Kendall, In Ray Musical Instruments, et cetera, those cases all concern parallel conduct by completely independent parties. And we don't have that here. We've alleged extensively, I think, at paragraph 71 and 104 of our complaint, all of the contractual interconnectedness between them and the fact that they share profits, they share finances, and so they all have a common incentive to make sure that Kaiser Health is the dominant force and remains the dominant force in Solano County for obvious financial reasons. And with that, thank you, Your Honors. Thank you, Counsel. We appreciate your arguments this morning. Very interesting matter submitted.
judges: Paez, Bea, Jack